IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

97 MAR 31  AM 10: 37

U.S. DISTRICT COURT
N.D. OF ALABAMA

BOBBY GLENN SUTHERLAND,              )
AIS # 146599                         )
                                     )
          Plaintiff,                 )
                                     )
vs.                                  )        Case No. CV-95-B-2255-J
                                     )
ALABAMA DEPARTMENT OF                )
CORRECTIONS; RON JONES,              )
Commissioner; CORRECTIONAL           )
MEDICAL SYSTEMS; MICKI               )
COCHRAN, Director of Nursing;        )
DR. JOHN BATES; DR. GEORGE           )
LYRENE; and DR. GAYLE WILLIAMS,      )
                                     )
          Defendants.                )

**ENTERED**

MAR 3 1 1997

MEMORANDUM OF OPINION

        This is a civil action pursuant to 42 U.S.C. § 1983 in
which the plaintiff, Bobby Glenn Sutherland, alleges that his
constitutional rights were violated while incarcerated at the
Hamilton Aged and Infirmed Center in Hamilton, Alabama. The *pro se*
complaint was filed on September 1, 1995, naming as defendants the
Alabama Department of Corrections, Commissioner Ron Jones,[1]
Correctional Medical Systems ("CMS"), Director of Nursing Micki
Cochran, Dr. John Bates, Dr. George Lyrene, and Dr. Gayle Williams.
Plaintiff claims that he has been denied constitutionally adequate

_____

        [1]Ron Jones is the former Commissioner of the Department of Corrections.

medical care in a number of specific ways. For example, he asserts
that he was denied medication for the treatment of his post-polio
condition; that he has been denied adequate medical treatment for
ear and sinus infections; that he has been denied adequate medical
treatment for chronic ailments; that he has been denied physical
therapy; that he has been unable to obtain repairs for his
wheelchair and orthopedic shoe and leg brace; and that he has been
denied access to physicians. He seeks compensatory and punitive
damages.  Although the complaint was initially referred to a
magistrate judge for a preliminary review and recommendation, *see*
*McCarthy v. Bronson*, 500 U.S. 136 (1991), that reference is now
withdrawn.

On September 28, 1995, the court entered an order for
special report directing that copies of the complaint in this
action be forwarded to each of the named defendants and requesting
that they file a special report responding to the factual allega-
tions of the complaint.  On November 7, 1995, the institutional
defendants -- the Alabama Department of Corrections and Corrections
Commissioner Jones -- filed their special report, attaching the
affidavit of defendant Jones.  On November 9, 1995, the medical
defendants -- CMS, Nurse Cochran, Dr. Bates, Dr. Lyrene, and Dr.
Williams -- filed their special report, accompanied only by 236
pages of plaintiff's prison medical records, dated from Decem-

2

ber 27, 1993, to October 1, 1995.[2]  By order of November 14, 1995, the parties were notified that the special reports filed by the defendants would be construed as  motions for summary judgment, and plaintiff was notified of the provisions and consequences of Rule 56 of the *Federal Rules of Civil Procedure.*  Plaintiff filed responses on December 29, 1995, and January 17, 1996.

On May 13, 1996, the court entered an order for a supplemental response, directing the medical defendants to "file as a supplemental special report affidavits meeting the requirements of Rule 56(e) and addressing *each* of plaintiff's factual allegations." (Emphasis in original.)  On June 13, 1996, the medical defendants filed a supplemental special report, attaching the affidavits of defendants Bates and Williams and the affidavit of Nurse Denise Wells.  Subsequently, the medical defendants submitted certified copies of plaintiff's prison medical records covering dates from January 1995 to May 1996.

By order of June 19, 1996, the parties again were notified that the supplemental special report filed by the defendants would be construed as a motion for summary judgment, and plaintiff was again notified of the provisions and consequences of Rule 56 of the *Federal Rules of Civil Procedure*. Plaintiff filed a response on July 19, 1996.

---

[2]These records were not sworn or certified as required by Rule 56(e), FED. R. CIV. P.  However, in response to an order by the court, the medical defendants have now provided certification of these records.

## Summary Judgment Standard

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law.

4

*See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v.
Parker*, 898 F.2d 1530 (11th Cir. 1990), *cert. denied*, 498 U.S. 1103
(1991).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts
> when the plaintiff fails to establish a prima
> facie case.  "In such a situation, there can
> be 'no genuine issue as to any material fact,'
> since a complete failure of proof concerning
> an essential element of the non-moving party's
> case necessarily renders all other facts
> immaterial."  Thus, under such circumstances,
> the public official is entitled to judgment as
> a matter of law, because the plaintiff has
> failed to carry the burden of proof.  This
> rule facilitates the dismissal of factually
> unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (citation omitted).

## Facts

Applying these standards to the evidence before the
court, the following facts appear to be undisputed or, if disputed,
have been taken in a light most favorable to the plaintiff.
Plaintiff, who contracted polio as an infant in 1936, is incarcer-
ated in the Hamilton Aged and Infirmed Center ("Hamilton").  Until
January 1995, Dr. Nagi was the staff psychiatrist at Hamilton.
According to plaintiff, Dr. Nagi was treating him for nerve damage
caused by poliomyelitis.  He has submitted what appears to be a
portion of a newsletter published by a polio support group, part of

which is entitled "Polioencephalitis: Explaining Post-Polio Fatigue and Pain."[3]   This article indicates that psychological stress can cause post-polio victims to suffer "overwhelming fatigue, muscle weakness, and pain."   Plaintiff states that while Dr. Nagi "tried different medications with plaintiff, he always went back to Antivert,[4] Elavil,[5] and Ativan,[6] the medicine plaintiff was taking when [he arrived at the] prison."   (Plaintiff's affidavit filed January 17, 1996, at 2).

The medical records submitted by the medical defendants establish that on January 14, February 19, May 28, and September 3, 1994, plaintiff complained to Dr. Nagi of physical ailments including vertigo, leg cramps, itching, and "pains."   Dr. Nagi noted on September 3, 1994, that plaintiff "was tearful when he talked about his leg cramps and his suffering," but there is no indication that he prescribed any medication to deal with the physical problems of cramps and pain.

On January 10 and February 7, 1995, plaintiff was seen by Dr. Gail Williams, the state Mental Health Director for CMS.

-------------------

[3]It does not appear that this newsletter is a learned treatise and, so, is not admissible evidence.

[4]Antivert is a medication for treatment of nausea associated with motion sickness and vertigo. See 1996 Physicians' Desk Reference, p. 2185.

[5]Elavil is Amitriptyline HCL, a medication for treatment of depression. See 1996 Physicians' Desk Reference, p. 2839.

[6]Ativan is lorazepam, a narcotic used to treat anxiety. It can be physically and psychologically addictive. See 1996 Physicians' Desk Reference, p. 2700.

Plaintiff states that there was no "examination" on either of these occasions. On January 10, he was in Dr. Williams' presence "all of 2 or 3 minutes. It was more of an introduction! [Dr. Williams] told [plaintiff] his name and ask[ed] how [plaintiff] was doing. [Plaintiff] told him fine except for infected ears and sinus. [Dr. Williams] said: I'll leave your medication as it is and see you next month." (Plaintiff's affidavit filed July 19, 1996, at 3).[7] Dr. Williams wrote the following note documenting the meeting:

> Seen at Ham A/I. Wheelchair, 2° "post polio"
> syndrome. Doing 99x3 in re sex charges.[8] Lot
> of denial & intellectual defenses. No [evi-
> dence] of psychosis. Inclined to be drug-
> seeking.
> AXIS I  pedophilia
> AXIS II personality disorder NOS (probably
> antisocial).
> Wants no change in his med. orders, but his
> Ativan and Elavil have no [illegible] indica-
> tion other drug-seeking and symptom exaggera-
> tion.
> F/u by me [illegible] mo.
> F/u by Dr. Bates re med renewals please.

On January 11, 1995, Dr. Bates "ordered that [plaintiff's] medications be tapered off over a period of time." (Williams

---

[7]Dr. Williams states in his affidavit that he "examined" plaintiff on January 10, 1995, and February 7, 1995. However, he does not state how long these examinations lasted or what the examinations consisted of. He merely states that he "noted in [plaintiff's] medical records there was no sign of psychosis with this inmate and he instead appeared to be seeking drugs. Specifically, this inmate appeared to be exaggerating his symptoms in order to continue his medications."

[8]This sentence indicates that the plaintiff is currently serving three 99-year sentences in relation to sexual-offense convictions.

affidavit at 1).   Dr. Williams concurred in this decision. *Id.*
Plaintiff states that, since his medication was discontinued, he
suffers from "muscle spasms" and cramps that interfere with his
ability to sleep. (Complaint at 2).[9]  In a follow-up session with
Dr. Williams, on February 7, 1995, plaintiff complained bitterly
about the discontinuation of his medication.   Dr. Williams noted
the session as follows:

> F/u at Ham A&I.   He spent entire session
> raging about not getting his Elavil and Ati-
> van.   Swearing and threatening federal litiga-
> tion.
> Dx [diagnosis]- no change
> Rx- as per Dr. Bates.

Plaintiff states that in January 1995, he developed ear
and sinus infections.  On January 13, 1995, he saw Dr. Bates, who
prescribed a 7-day course of medication.  The medication arrived on
January 16, but "ran out" after five days.  Plaintiff signed up for
sick call, but was not seen by Dr. Bates for four days, when Dr.
Bates "ordered ear drops for five days."  Plaintiff states that
"[t]his going to sick call screening, seeing Dr. Bates three or
four days later allowed the infection to spread to [his] throat and
bronchial tubes [and] the pain in [his] ears and head to escalate.
Also, vertigo caused dizziness and the feeling [he] was going to

---

[9]The court notes that plaintiff has also stated that "defendant Williams discontinued all plaintiff's
medication without improving plaintiff's condition." Plaintiff's affidavit filed January 17, 1996, at 2.

vomit.  Plus, [he had] muscle spasms, cramps in all [his] extremi-

ties." (Complaint at 1).

In  a  memorandum  dated  April  20,  1995,  Nurse  Cochran

stated:

> Inmate Bobby Sutherland has chronic complaints
> of  vertigo,  ear  pain,  and  sinus  problems.
> Since  January  1995,  he  has  had  medication
> ordered  eighteen  times  for  these  chronic
> complaints.
>
> In  review  of  his  MAR's[10]  medication  was  found
> not  to  be  available  on  two  occasions.   One
> medication  was  Naphcon  Eye  Drops  which  was
> ordered  on  1/20/95.   This  medicine  was  or-
> dered,  however,  it  was  not  sent  by  CPSI  until
> 1/25/95.   The  other  occasion  was  on  2/17/95  in
> which  Amoxicillin  was  not  available  for  one
> dose  only.
>
> Also,  in  review  of  the  MAR's,  Mr.  Sutherland
> has  been  non-compliant  with  his  medicine
> regime.   He  has  not  completed  any  medications
> ordered  as  he  does  not  show  for  pill  call  or
> refuses  to  take  the  medication.   Of  the  eigh-
> teen  different  times  he  has  had  medication
> ordered  he  has  had  ample  opportunities  to  talk
> with  me.

In his affidavit, Dr. Bates states:

> [Plaintiff]  has  been  seen  by  me  47  times
> within  a  1-1/2  year  period  of  time  for  the
> same  complaint.   On  none  of  these  occasions
> was  [plaintiff]  found  to  be  in  any  sort  of
> extremis.   He  was  also  found  to  have  a  normal
> physical  exam  on  most  of  these  occasions  as  it
> related  to  his  symptoms.   [Plaintiff]  often
> presented  with  complaints  such  as  the  follow-

---

[10]"MAR" means medication administration records.

ing: "There is something going bloop-bloop-bloop in my left ear."

[Plaintiff] was seen on so many occasions with normal exam that I requested the nurse limit his sick call visits to those where he had a fever. [Plaintiff] frequently abused the sick call system and required time that could have been spent with truly sick inmates.

In my opinion [plaintiff] was once medicated for chronic symptoms.  It is interesting to note that he has suffered no major asthmatic attac[k]s or vertigo symptoms requiring pro- longed bed rest.  This indicates to me that my medical judgment was correct.

It is not clear what one and one-half year period Dr. Bates is referring to, nor does Dr. Bates identify the "same complaint" plaintiff was seen for on the 47 occasions referred to.  Plain- tiff's prison medical records indicate that Dr. Bates first ordered that plaintiff not be "put through" at sick call unless he had a fever on March 22, 1995, and that this order was repeated on April 17, 1995, and again on November 29, 1995.

Plaintiff asserts that he has sought medical attention for ear and sinus infections, bronchitis, vertigo, muscle spasms, muscle cramps and debilitating pain.  He indicates that Dr. Bates continues to refuse to see him unless he has a fever.  According to plaintiff, "fever isn't involved in most of [his] medical prob- lems." (Plaintiff's affidavit filed July 19, 1996, at 2).  For example, when his "bronchial tubes fill with mucus and it's difficult breathing," he may not have a fever. *Id.*  Plaintiff

"reported to sick call August 17, 1995, to see Dr. Bates, [but] he would not see [plaintiff].  Instead he placed [plaintiff] in the chronic care clinic."  Plaintiff asserts that, as of July 1996, he has not "been evaluated." *Id.* at 3.

On November 10, 1995, plaintiff submitted a health services request form in which he complained of "[s]ore throat, ears ringing and hurting, coughing up blood, and burning pain all in [his] body."  However, he was a "no show" at medical screening on November 11.   Plaintiff's prison medical records indicate that plaintiff was seen by Dr. Bates on November 13.   Dr. Bates' notations indicate that the bleeding was "coming from [plaintiff's] sinuses," but it is not clear whether Dr. Bates made any diagnosis. Plaintiff states that Dr. Bates had x-rays made, but did not prescribe any medication.  Plaintiff was never told what the x-rays revealed.  "Plaintiff bled for two weeks; Dr. Bates saw plaintiff on November 29, 1995." (Plaintiff's affidavit filed January 17, 1996. at 2).  Plaintiff also states that he "has been in pain so bad the pain caused him to vomit making him unable to sleep or eat the last 3 months.  For the last 11 months, plaintiff's ears and sinus have been infected, waiting 3 to 10 days to see [the] doctor has been very painful." *Id.* at 3.

Plaintiff also states that Dr. Bates conducts "30 second assembly line examinations" and that he has "never been examined by Dr. Bates more than 1 minute per visit." (Plaintiff's affidavit

filed July 19, 1996, at 1). He says that he has "been abed and very sick several times, [but] by the time [he] see[s] the doctor most of the symptoms are no longer adequate enough to satisfy Dr. Bates' 30 second exams." *Id.* at 3.

According to plaintiff, the orthopedic shoes and leg brace that he needs in order to walk are "worn out," and his wheelchair needs to be "repaired or replaced," but the "Department of Corrections and the Medical Department have refused to fix either one." (Complaint at 3; plaintiff's affidavit filed December 29, 1995, at 2). He alleges that, as a consequence, he experiences "extreme pain" and "great difficulty in trying to walk," as the "worn out brace let[s] plaintiff's foot flop around causing great difficulty in balancing and plaintiff falls." (Plaintiff's affidavit filed December 29, 1995 at 2; plaintiff's affidavit filed January 17, 1996, at 1).[11] Plaintiff has "ask[ed] [Dr. Bates] about getting [plaintiff's] shoes, leg brace and wheelchair replaced or repaired." (Plaintiff's affidavit filed July 19, 1996, at 2). Nurse Wells, the current Director of Nursing at Hamilton (and who is not a defendant in this action), has been "working with Jayne Hayes, RN, on a prosthetic clinic" for plaintiff. (Wells affidavit at 1). The two nurses met with plaintiff on May 10, 1996, "for evaluation. Plans [were] made for

---

[11] Nurse Wells states in her affidavit that plaintiff "is able to walk," but she does not state whether he is able to do so without the assistance of an orthopedic shoe and brace. Dr. Bates does not address plaintiff's ability to walk or his need for the shoe, brace, or wheelchair.

[plaintiff] to see the person conducting this clinic on May 21, 1996." *Id.* According to Nurse Wells, "it [would] be their judgment call as to [plaintiff's] need." *Id.* Plaintiff states that he "went to a prosthetic clinic [on] May 21, 1996," but "nothing has changed." (Plaintiff's affidavit filed July 19, 1996, at 3).

## Alabama Department Of Corrections

Plaintiff has named the Alabama Department of Corrections as a defendant. However, it is well settled that the Eleventh Amendment to the United States Constitution bars § 1983 claims in federal court against the state or an agency of the state. *Alabama v. Pugh*, 438 U.S. 781 (1978); *see also Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984). As the Supreme Court has stated:

> [T]here can be no doubt... that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit. *Edelman v. Jordan*, 415 U.S. 651 (1974); *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459 (1945); *Worcester County Trust Co. v. Riley*, 302 U.S. 292 (1937). Respondents do not contend that Alabama has consented to this suit, and it appears that no consent could be given under Art. I, sec. 14, of the Alabama Constitution, which provides that "the State of Alabama shall never be made a defendant in any court of law or equity."

*Alabama v. Pugh*, 438 U.S. at 782.   Accordingly, plaintiff cannot maintain a § 1983 action against the Alabama Department of Corrections and the claims against this defendant are due to be dismissed.

<u>Commissioner Jones</u>

Plaintiff names Commissioner Jones as a defendant; however, in his original complaint he did not allege that Commissioner Jones was personally involved in any way in the incidents complained of.   In his response filed December 29, 1995, plaintiff states:

> Defendant Jones did away with the inmate grievance procedure, the only appeal plaintiff had to bring lack [of] proper medical care to the attention of the Department of Corrections.   Also: Defendant Jones did authorize and condoned [sic] the medical department making inmates buy their medication.   That defendant Jones is acting in concert with Correctional Medical Systems, therefore: Helping to deny plaintiff of adequate medical care.

To the extent that plaintiff is attempting to implicate Commissioner Jones through the concept of *respondeat superior,* it is clear that "[t]here is no *respondeat superior* liability under § 1983." *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995) (*citing Monell v. Department of Social Services*, 436 U.S. 658, 690-

92 (1978), and *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994).

Plaintiff's vague and conclusory assertions are not sufficient to establish that Commissioner Jones knew of, sanctioned, participated in, or was otherwise "affirmatively linked" to the *specific* instances in which plaintiff complains that he was denied adequate medical care. *See Gilmere v. City of Atlanta*, 774 F.2d 1495, 1504 (11th Cir. 1985), *cert. denied*, 476 U.S. 1115 (1986). Because the allegations concerning Commissioner Jones are insufficient to state a claim upon which relief under § 1983 can be granted, *see Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984), he is entitled to summary judgment.

## Correctional Medical Services, Inc.

While a corporation providing prison medical services may be liable under § 1983 if it can be shown that the constitutional violation was the result of the corporation's policy or custom, *see Ort v. Pinchback*, 786 F.2d 1105, 1107 (11th Cir. 1986), such a corporation may not be held liable under § 1983 on the basis of *respondeat superior* alone, *see Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992); *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Plaintiff has named as a defendant Correctional Medical Services, Inc. ("CMS"), the corporation currently

providing medical services to the Hamilton Aged and Infirm Center. Plaintiff asserts that CMS charges inmates $3.00 to see a doctor "that never looks at and/or never touches you." He does not, however, claim that the alleged failure of the doctor to conduct a proper examination is due to any policy or custom of CMS. Plaintiff also claims that "a blood pressure check and/or any type of nursing service cost[s] $3.00."

While charging inmates for medical services appears to be properly categorized as a policy or custom of CMS, plaintiff has failed to demonstrate that this particular policy or custom contributed in any way to the claimed constitutional violations. Additionally, plaintiff asserts that CMS "lacks any type of preventative health care," but he does not identify any injury he suffered as a result thereof. Moreover, there is no constitutional right to general "preventative health care"; it is only when "serious medical needs" are involved that an inmate is constitutionally entitled to medical attention. *See generally Estelle v. Gamble*, 429 U.S. 97 (1976); *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176 (11th Cir. 1994); *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989). Consequently, summary judgment should be granted in favor of CMS and the corporation should be dismissed from this action.

## Inadequate Medical Care

In *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976), "the Supreme Court held that deliberate indifference to serious medical needs is proscribed by the Eighth Amendment's prohibition against cruel and unusual punishment." *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994).  A two-part analysis is employed in determining whether an Eighth Amendment violation has occurred. "First, we must evaluate whether there was evidence of a serious medical need; if so, we must then consider whether [the defendants'] response to that need amounted to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989).  The first inquiry is objective; the second inquiry is subjective. *See Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1186 (11th Cir. 1994).

"'[A] "serious" medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d at 1187 (quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977)).  "[T]he medical need of the prisoner need not be life threatening" to be considered "serious." *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir. 1988).

The second part of the inquiry -- whether the response of the defendants amounted to deliberate indifference -- is itself a two-part determination. A defendant may be held liable for an Eighth Amendment violation only if he had "knowledge of the [plaintiff's] particular medical condition," *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d at 1191 (emphasis omitted), *and* he acted intentionally or recklessly to deny or to delay "access to medical care" or to interfere "with the treatment once prescribed," *Estelle v. Gamble*, 429 U.S. at 104-05. *See also Mandel v. Doe*, 888 F.2d at 788. *See generally Farmer v. Brennan*, 511 U.S. 825, ___, 114 S.Ct. 1970, 1977-81 (1994). "Mere negligence or medical malpractice" on the part of the defendants is not sufficient to support an Eighth Amendment claim. *Mandel v. Doe*, 888 F.2d at 787-88. *See also Estelle*, 429 U.S. at 106. Therefore, an accidental or inadvertent failure to provide medical care or negligent diagnosis or treatment of a medical condition does not constitute a wrong under the Eighth Amendment. *Barfield v. Brierton*, 883 F.2d 923, 939 (11th Cir. 1989). "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). "Medical treatment violates the Eighth Amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be

18

intolerable to fundamental fairness.'" *Id.* (quoting *Rogers v.*
*Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).

Denial of Medications

Plaintiff has alleged that for many years prison
psychiatrist Dr. Nagi was treating "his nerve damage caused by
poliomyelitis" with the drugs Antivert, Elavil, and Ativan.
Nothing in the prison medical records, however, reflect that such
was the reason for Dr. Nagi's prescriptions. It is undisputed
that, in January 1995, Dr. Bates, with Dr. Williams' concurrence,
ordered that these medications be discontinued. Dr. Williams
states that he saw plaintiff on January 10, 1995, noting that
"there was no sign of *psychosis* with this inmate and he instead
appeared to be seeking drugs." (Emphasis added.) Plaintiff's
assertion that Dr. Williams spent only two or three minutes with
him is uncontradicted by Dr. Williams, but he did write the
following note in the plaintiff's prison medical file:

> Seen at Ham A/I. Wheelchair, 2° "post polio"
> syndrome. Doing 99x3 in re sex charges. Lot
> of denial & intellectual defenses. No [evi-
> dence] of psychosis. Inclined to be drug-
> seeking.
> AXIS I  pedophilia
> AXIS II personality disorder NOS (probably
> antisocial).
> Wants no change in his med. orders, but his
> Ativan and Elavil have no [illegible] indica-
> tion other drug-seeking and symptom exaggera-
> tion.
> F/u by me [illegible] mo.
> F/u by Dr. Bates re med renewals please.

The next day, on January 11, 1995, Dr. Bates ordered,[12] "Taper
Ativan by ½ [illegible] until discontinued.  D/C Elavil."  The note
had the effect of slowly decreasing the Ativan until it was
discontinued altogether by February 1, 1995.

Dr. Williams again met with plaintiff on February 7,
1995, and wrote the following note:

> F/u at Ham A&I.  He spent entire session
> raging about not getting his Elavil and Ati-
> van.  Swearing and threatening federal litiga-
> tion.
> Dx [diagnosis]- no change
> Rx- as per Dr. Bates.

Although plaintiff claims that he was given these drugs
by Dr. Nagi for *physical* problems associated with the after-effects
of polio, that simple assertion is inadmissible to prove the
medical necessity of the medications.  Neither the medical records
nor any testimony from Dr. Nagi establish that the medications
ordered by him were for physical problems as opposed to psychologi-
cal problems, or that the decisions by Drs. Williams and Bates to
discontinue the Elavil and Ativan were medically unreasonable.
Indeed, it would seem unlikely that Dr. Nagi, a psychiatrist, would
be concerned with *physical* ailments when plaintiff was then being
treated by another physician, Dr. Bates.  In the absence of any

---

[12]  It appears from the Medication Administration Records
maintained by the nurses that it was Dr. Nagi who discontinued
plaintiff's Antivert and Atarax in late December 1994.

20

medical notes from Dr. Nagi that his intent was not to treat plaintiff's psychological problems but his physical condition, the court simply cannot draw that conclusion.[13]

This case is distinguishable from *Steele v. Shah*, 87 F.3d 1266, 1267 (11th Cir. 1996), a case recently decided by the Eleventh Circuit Court of Appeals, in which inmate Steele was initially incarcerated at Polk Correctional Institution where he was considered "highly 'labile'" and a suicide risk by the prison psychological specialist and the prison psychiatrist. Psychotropic drugs were prescribed for Steele, and he was seen on a regular basis by the psychological specialist, and occasionally by the psychiatrist during the month and one-half that he was at Polk. Steele was then transferred to a county jail, "accompanied by no medical records but only his 'Treatment Plan,' which apparently outlined the course of drugs prescribed by the doctors at Polk but contained little other information." *Id.* at 1267. Five days later, on November 26, 1991, Steele was seen by the jail psychiatrist, Dr. Shah. According to Steele, Dr. Shah announced, without conducting any examination of Steele, that Steele's psychotropic medications would be discontinued. Although Steele filed grievances and sought the intervention of the Polk psychiatrist and psychiatric special-

---

[13]Indeed, all of the medical notes written by Dr. Nagi are concerned with plaintiff's psychological status, addressing concerns about depression and anxiety. Although there are passing references to muscle cramps, they appear to be pertinent only insofar as they contributed to plaintiff's depression or anxiety, not as causes for treatment in themselves.

ist, his psychotropic drugs were discontinued and he remained without them until he was transferred back to Polk six months later. "After the loss of the drugs, Steele suffered from insomnia, anxiety, and various bodily pains." *Id*. at 1267-68.

Steele filed a § 1983 action against Dr. Shah, "claiming that Shah exhibited deliberate indifference to his serious medical needs in peremptorily discontinuing Steele's medication without actually examining Steele or reviewing his medical records or consulting with the medical staff at Polk." *Id*. at 1268. Shah filed a motion for summary judgment, submitting "materials which gave an account critically at odds with" Steele's regarding the November 26 appointment. *Id*. According to Dr. Shah, Steele "was cooperative and answered a number of questions, demonstrating no symptoms that would require psychotropic drugs or any treatment beyond 'supportive therapy.'" *Id*. The district court granted Shah's motion for summary judgment, concluding that "at best, [Steele] has demonstrated a difference in medical opinion between [Dr. Shah] and himself as to the latter's diagnosis or course of treatment, which does not support a claim of cruel and unusual punishment." *Id*. at 1269.

The Eleventh Circuit reversed on the authority of *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990). In *Greason*, the court observed that:

> [T]he evidence as forecast in the summary
> judgment record would have supported a jury
> finding that a prison psychiatrist had abrupt-
> ly discontinued a prisoner's psychotropic
> drugs on the basis of a visit of a "few min-
> utes" and without reviewing the prisoner's
> medical file or doing a "mental status exami-
> nation" and that had he reviewed the file, he
> would have seen that the prisoner was a seri-
> ous suicide risk. [The court] concluded that
> on those facts, a jury would have been enti-
> tled to find that the private doctor afforded
> the prisoner grossly inadequate care and "that
> he realized he was doing so at the time" thus
> exhibiting deliberate indifference to the
> prisoner's needs.

*Steele*, 87 F.3d at 1269.  The court found the facts in *Steele*

> [N]ot materially distinguishable from *Greason*
> on the question whether the conduct charged,
> if found in Steele's favor, would support a
> finding of deliberate indifference violative
> of constitutional rights.   A jury accepting
> Steele's account of his encounters with Shah
> and of Shah's conduct would be entitled to
> find that Shah discontinued Steele's medica-
> tion on the basis of one cursory interview and
> without having reviewed any medical records
> beyond the Treatment Plan sent over from the
> Polk facility.   It could thus "conclude that
> [Shah] knew of a substantial risk from the
> very fact that the risk was obvious" and that
> Shah deliberately disregarded that risk.

*Steele*, 87 F.3d at 1270 (alteration in original).

In the present case, although there is no direct evidence

that either Dr. Bates or Dr. Williams reviewed Dr. Nagi's treatment

records for plaintiff before discontinuing the Elavil and Ativan,

that can be reasonably inferred inasmuch as Drs. Williams and Bates

23

were writing their notes in the *same* medical records as Dr. Nagi.
More importantly, Dr. Bates had a much more substantial opportunity
to assess plaintiff that did the brief encounter of the jail
psychiatrist in *Steele*.   Dr. Bates had been treating plaintiff
frequently and repeatedly for at least nine months; he was very
familiar with plaintiff's *physical* condition and whether that
condition could be treated with *psychotropic* medication like Elavil
and Ativan.   Even though plaintiff asserts that had they reviewed
Dr. Nagi's medical records, they would have seen that Dr. Nagi
"knew [plaintiff] wasn't psychosis [sic], he was treating [plain-
tiff] for nerve damage caused by poliomyelitis," (Plaintiff's
affidavit filed July 19, 1996, at 3), there simply is no such note
or indication in the medical records.   As noted above, the medical
records submitted by the medical defendants establish that
plaintiff did, on several occasions, discuss his physical problems
with Dr. Nagi, but they do not indicate that Dr. Nagi was actually
treating plaintiff's "nerve damage."   Thus, even if it was true
that Dr. Nagi prescribed these medications to treat plaintiff's
"nerve damage," Drs. Williams and Bates could not have discerned it
from the records.

In view of the evidence presently before the court, the
holdings in *Greason* and *Steele* simply are not apposite.   Here,
unlike in those cases, defendants Williams and Bates discontinued
plaintiff's regime of psychotropic medications where it is

undisputed that there was no *psychological* reason for them.
Plaintiff simply has not shown that this medical decision was
professionally unreasonable, much less deliberately indifferent to
plaintiff's serious *physical* problems.  Absent such a showing of
deliberate indifference, defendants Williams and Bates are entitled
to summary judgment on this particular claim.

But even if Drs. Williams and Bates violated plaintiff's
constitutional rights by discontinuing administration of *psycho-
tropic* medication for *physical* ailments, they are entitled to
summary judgment on the basis of qualified immunity.  While *Greason*
and *Steele* may have clearly established the law that discontinuing
medication ordered by a previous physician without conducting a
reasonable examination and review of the inmate's medical records
can amount to deliberate indifference to his medical needs, the
facts in this case are markedly different for the reasons already
recounted above.  Dr. Bates was much more familiar with plaintiff's
physical condition than the psychiatrists involved in *Greason* and
*Steele* were and was in a better posture to assess plaintiff's need
for medication for his *physical* condition.   When Dr. Williams
confirmed that there was no *psychological* reason for plaintiff to
be on Elavil and Ativan, Dr. Bates was well within his expertise to
conclude that, because there was no *physical* need for them, they
should be discontinued.  *Greason* and *Steele* simply do not clearly
establish the law that two medical doctors can never lawfully and

reasonably decide to discontinue *psychotropic* medication ostensibly given for *physical* problems.

## Ear and Sinus Infections -- January 1995

Plaintiff claims that his ear and sinus infections were not properly treated, which allowed the infection to spread to his throat and bronchial tubes. Plaintiff admits that he was seen by Dr. Bates on January 13 for the ear and sinus infections and that a seven-day course of medication was ordered. While it appears that there was some delay in obtaining the medication and that the medication "ran out" after five days, plaintiff has not alleged any facts that would establish that either of these occurrences was due to the deliberate indifference of any of the named defendants. Plaintiff also admits that he was seen again by Dr. Bates, who "ordered ear drops for 5 days." While plaintiff claims that his problems continued and worsened, he does not deny that between January and April of 1995, medication was ordered for him on eighteen occasions. Nor does he deny that he "was non-compliant with his medicine regime" by failing to "show for pill call or refus[ing] to take the medication." Under these circumstances, it cannot be said that the defendants were deliberately indifferent to this particular medical need. This claim is due to be dismissed.

Denial of Treatment for Chronic Problems

Plaintiff asserts that he suffers from chronic ear and sinus infections, bronchial and asthma problems, and vertigo, and that Dr. Bates has "frequently treat[ed] these chronic ailments" over the last five years, but now refuses to do so. (Plaintiff's affidavit filed July 19, 1996, at 2).  Plaintiff further alleges that Dr. Bates has also discontinued the medications prescribed for these problems prior to his entering prison. (Complaint at 2). Aside from the Elavil and Ativan discussed above, plaintiff has not identified the medications or specified when Dr. Bates discontinued them. Dr. Bates has essentially admitted, however, that he no longer prescribes medication for what he characterizes as plaintiff's "chronic symptoms," but he points out that plaintiff "has suffered no asthmatic attac[k]s or vertigo symptoms requiring prolonged bed rest."  This suggests, of course, the lack of medical necessity for the medications.

Dr. Bates also admits that he has ordered that plaintiff's sick call visits be limited to those occasions when plaintiff has a fever.  This action was initially taken in March 1995.  Dr. Bates indicates that this action was taken because plaintiff "abused the sick call system," complaining on numerous occasions when he was "found to have a normal exam."  In essence, Dr. Bates indicates that, in his opinion, plaintiff is a hypochondriac, while plaintiff asserts that he suffers from a variety of

physical ailments, some of which are related to his post-polio condition. While a mere difference of opinion between an inmate and a prison physician as to diagnosis and treatment clearly does not rise to the level of a constitutional violation, plaintiff does more than merely disagree with Dr. Bates' diagnosis. Plaintiff maintains that Dr. Bates' examinations of him have been purely perfunctory, lasting less than one minute each. In addition to these examinations, however, plaintiff also is seen frequently by nursing staff who report their findings in plaintiff's medical jacket. It is not professionally or medically unreasonable for Dr. Bates to rely in part on the information contained in these reports. It is clear that an inmate is not constitutionally entitled to be seen by a doctor "every time [he has] the slightest ailment," *Vaughn v. Kerley*, 897 F. Supp. 1413, 1421 (M.D. Fla. 1995). Plaintiff's medical problems, while undoubtedly disconcerting to him, simply did not require more extensive treatment by a physician than that reflected in the medical records here. Consequently, summary judgment is due to be granted in favor of Dr. Bates on this claim.

Physical Therapy

Plaintiff complains that "there are no types of physical therapy at Hamilton,"[14] that "all [his] extremities are weakening,"

---

[14]Nurse Wells states in her affidavit that "the nursing staff are able to conduct full range of motion" physical therapy and that plaintiff is also able to "conduct some range of motion himself." Wells affidavit at 1.

and that he can "look forward to being bedridden if something is
not done about this deplorable situation." (Complaint at 3).
According to plaintiff, Dr. Nagi told him at some unspecified time
that "with [the] proper prothesis, medication and physical therapy,
[he] could get to walking again, and possibly go back working."
(Plaintiff's affidavit filed July 19, 1996, at 4). Even if this
statement, which appears to be nothing more than inadmissible
hearsay, see generally FED. R. EVID. 801(c), 802, is accepted for
summary judgment purposes, plaintiff has not alleged that Dr. Nagi
ever actually recommended or ordered that he be provided physical
therapy. Nor has he alleged that he has requested physical therapy
at any time while at Hamilton. Compare Durmer v. O'Carroll, 991
F.2d 64, 67 (3d Cir. 1993) (neurologist "specifically recommended
physical therapy" for inmate); LaFaut v. Smith, 834 F.2d 389, 393
(4th Cir. 1987) (paraplegic inmate made "repeated requests for
adequate rehabilitation therapy, and the reports of an orthopedic
specialist [indicated] that he was in need of such therapy").
Plaintiff has simply failed to establish that any of the named
defendants had knowledge that he needed or required physical
therapy. "'[K]nowledge of the asserted serious needs or of
circumstances clearly indicating the existence of such needs, is
essential to a finding of deliberate indifference.'" Hill v.
DeKalb Regional Youth Detention Center, 40 F.3d at 1191 (quoting
Horn ex rel. Parks v. Madison County Fiscal Court, 22 F.3d 653, 660

(6th Cir.), *cert. denied*, 115 S.Ct. 199 (1994)) (emphasis added in *Hill*).  This claim is due to be dismissed.

Broken Shoes, Brace, and Wheelchair

        Plaintiff claims that he has "tried since 1988 to get [his] worn out leg brace replaced or repaired to no avail.  This and [the lack of] orthopedic shoes has condemned [him] to a wheelchair these seven years." (Complaint at 3).  The court notes that this same essential claim was litigated in *Sutherland v. QuestCare, et al.*, CV-92-HM-2265-J,[15] beginning in 1992.  The court found there that plaintiff was transported to St. Clair Correctional Facility on August 18, 1992, for a brace fitting; that the Department of Corrections ordered orthopedic shoes; that, on September 24, 1992, the shoes were mailed to Durr-Fillauer Orthopedic in Chattanooga, Tennessee, to be fitted for a brace, and that plaintiff received the shoe and brace on October 14, 1992.  Plaintiff's claim is thus deemed to be that the shoes and brace he received in October 1992, are now worn out.  Plaintiff asserts that "the medical personnel" knew that he needed a new shoe and brace (complaint at 3), but he has failed to provide any evidence demonstrating that Dr. Lyrene and Nurse Cochran, specifically, had

---

[15]In *Sutherland v. QuestCare, et al.*, this same plaintiff claimed that he had been denied adequate care on several occasions.  Dr. Bates, Dr. Lyrene, and Nurse Micki Azarch (who plaintiff states is now known as Micki Cochran) were named as defendants in that case.  With his affidavit filed January 17, 1996, plaintiff has submitted copies of the affidavits Dr. Bates, Dr. Lyrene, and Nurse Azarch [Cochran] filed in *Sutherland v. QuestCare.*

any knowledge of this need.  As noted above, knowledge is "'*essen-tial* to a finding of deliberate indifference.'"  Consequently, this claim is due to be dismissed as to Dr. Lyrene and Nurse Cochran.

Plaintiff also claims that his wheelchair needs repairing or replacing.  Plaintiff's allegation that he experiences "extreme pain" and "great difficulty in trying to walk" because his "worn out brace let[s] [his] foot flop around causing great difficulty in balancing and [he] falls," if true, clearly demonstrates that plaintiff has a serious medical need for a new shoe and brace.  However, the court notes that plaintiff has offered no facts to support his conclusory assertion that his wheelchair needs to be "repaired or replaced."

While plaintiff states that he "ask[ed] [Dr. Bates] about getting [his] shoe, leg brace, and wheelchair replaced or re-paired," he does not allege the date(s) on which he made his request(s).  Furthermore, he does not allege that he apprised Dr. Bates at any time of the difficulties that he was having with his present shoe and brace.  He has therefore failed to demonstrate that Dr. Bates had knowledge of this specific serious medical need. Thus, this claim is also due to be dismissed as to Dr. Bates.

Plaintiff also claims that Dr. Bates, Dr. Lyrene, and Nurse Cochran have "conspire[d] to deny [him] proper orthopedic shoes and [a] leg brace." (Plaintiff's affidavit filed January 17, 1996, at 1).  However, plaintiff has failed to allege any facts

that would support this assertion.  Allegations of conspiracy must be specific and based upon facts rather than conclusions. *Fullman v. Graddick*, 739 F.2d 553 (11th Cir. 1984).  "A complaint may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy." *Id*. at 557. Because plaintiff has failed to allege any facts to support his conspiracy claim, that claim is due to be dismissed.  See *Phillips v. Mashburn*, 746 F.2d 782 (11th Cir. 1984).

Nurse Cochran

          Plaintiff claims that Nurse Cochran "denied him access to the doctors." Complaint at 2.  While plaintiff asserts that these denials occurred in June and August of 1995, he provides no facts to support his claim.  Conclusory, vague, and general allegations are insufficient to state a claim upon which relief under § 1983 can be granted. *See Fullman v. Graddick*, 739 F.2d 553, 556-57 (11th Cir. 1984).  This general complaint fails to identify the circumstances of the denial or that it resulted in denial of care for a serious medical need.  The court is simply left to speculate whether plaintiff suffered an untreated serious medical need due to Nurse Cochran's refusal to schedule plaintiff to be seen by a physician.

          Furthermore, it is undisputed that on March 22 and April 17, 1995, Dr. Bates had directed the nurses to "limit

[plaintiff's] sick call visits to those where he had a fever."
(Bates affidavit at 1).  There is no indication that these orders
had been rescinded in June and August of 1995.  As plaintiff
himself recognizes, the "nursing staff can't do anything without
the doctor's orders." (Plaintiff's affidavit filed July 19, 1996,
at 4).  This claim is due to be dismissed.

Dr. Lyrene

        Plaintiff asserts that he asked to see Dr. Lyrene in June
1995, "about his medical problems," but Dr. Lyrene "would not see
[him]." (Complaint at 2).  However, plaintiff has provided no
description of the "medical problems" he was experiencing at the
time.  Nor has he shown how the ordinary medical-screening
procedures at Hamilton were so inadequate that he needed to be seen
by the state medical director of C.M.S.  Plaintiff has therefore
failed to establish that he had a serious medical need, which is an
essential element of his claim, or that there was any deliberate
indifference to the need.  Simply because Dr. Lyrene insisted that
plaintiff use the standard medical screening procedure does not
mean that he was deliberately indifferent to plaintiff's needs.
This claim is due to be dismissed.

## Conclusion

Accordingly, for the reasons stated above, the court concludes that there are no genuine issues of material fact and that the defendants are entitled to judgment as a matter of law. By separate order their motion for summary judgment will be granted.

DATED this 31st day of March, 1997.


_____
SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE